## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|                                   |     |                           |
|-----------------------------------|-----|---------------------------|
| **SHELIA POWELL,**                | )   |                           |
|                                   | )   |                           |
| **Plaintiff,**                    | )   |                           |
|                                   | )   |                           |
| **v.**                            | )   | **No. 2:20-cv-02856-JTF-atc** |
|                                   | )   |                           |
| **BAPTIST MEMORIAL HOSPITAL and** | )   |                           |
| **TARA ETTER,**                   | )   |                           |
|                                   | )   |                           |
| **Defendants.**                   | )   |                           |

## REPORT AND RECOMMENDATION
## TO GRANT MOTION FOR SUMMARY JUDGMENT

Before the Court by order of reference[1] is Defendant Baptist Memorial Hospital's

("Baptist") Motion for Summary Judgment,[2] filed August 15, 2022.  (ECF No. 66.)  *Pro se*

Plaintiff Shelia Powell filed her response to the motion on September 19, 2022.  (ECF No. 69.)

With leave of Court (ECF No. 74), Powell submitted additional support for her response (ECF

No. 70).  After being granted an extension of time and leave to file additional pages (ECF Nos.

---

[1] Pursuant to Administrative Order No. 2013-05, this case has been referred to the United States Magistrate Judge for management and for all pretrial matters for determination or report and recommendation, as appropriate.

[2] The claims against Tara Etter, who was named in Powell's original complaint, were terminated on March 17, 2022, when District Court Judge John T. Fowlkes adopted the undersigned's report and recommendation disposing of those claims.  (ECF No. 50.)  Judge Fowlkes granted Powell leave to amend on March 18, 2022, deeming the amended complaint at ECF No. 47-1 filed. (ECF No. 51.)  That amended complaint re-asserted the previously dismissed claims against Etter.  Baptist thus filed its Summary Judgment Motion "on behalf of Baptist Memorial Hospital – Memphis only" but asserted that "the facts and arguments contained in this Motion and the Statement of Undisputed Material Facts and Memorandum in Support of the Motion are all equally applicable to both Ms. Etter and Baptist Memorial Hospital – Memphis."  (ECF No. 66, at 1 n.1.)  Because Etter has been dismissed from this action, this R&R does not address any of the claims made against her in Powell's amended complaint.

73, 78), on October 11, 2022, Baptist filed its response to Powell's statement of facts (ECF No. 76), and on October 12, 2022, Baptist filed its reply brief (ECF No. 79). Judge Fowlkes denied Powell's motion for leave to file a sur-reply. (ECF Nos. 82, 84.) For the reasons stated below, it is recommended that the motion be granted in its entirety.

## **PROPOSED FINDINGS OF FACT**

As a threshold matter, the Court must address which facts are undisputed for purposes of ruling on the motion. Contemporaneous with its motion, Baptist filed a statement of thirty-four undisputed facts. (ECF No. 66-2.) Baptist contends that Powell's response to those facts (ECF No. 69-2) violates Local Rule 56.1(b) by "fail[ing] to respond to each fact set forth in Defendant's statement of undisputed material facts in any way to allow the Court to assess which facts she does and does not dispute." (ECF No. 76, at 2.) Baptist asserts that Powell's failure to specify which facts are disputed or why warrants deeming them admitted for the purpose of the summary judgment motion. (*Id.*) Baptist further argues that, to the extent Powell's own statement of disputed facts exceeds the five-page limit imposed under Local Rule 56.1(b), those facts should be disregarded. (*Id.*)

Powell has indeed failed to follow Local Rule 56.1(b), which provides:

Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:
> (1) agreeing that the fact is undisputed;
> (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
> (3) demonstrating that the fact is disputed.
Each disputed fact must be supported by specific citation to the record. Such response shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant.

Powell's response to Baptist's undisputed facts contains seventy-one numbered paragraphs. (ECF No. 69-2.)  It is not made on the document provided by Baptist, or a facsimile of that document, as the rule requires.  This Court takes a dim view of violations of the Local Rules and has deemed facts admitted when a party fails to follow the requirements of Local Rule 56.1. *Nixon v. Hardin Cnty. Bd. of Educ.*, 988 F. Supp. 2d 826, 829–30 (W.D. Tenn. 2013).

Powell's submission is not a mere technical violation of the Local Rules.  Instead, her response is numbered in such a way as to make it nearly impossible to discern which facts she is admitting, admitting merely for the purpose of the motion, or disputing, and what authority she is relying on to demonstrate that certain facts are, in fact, disputed.  And it appears that she has not responded to some of Baptist's facts at all.  The Court is not required to sift through pleadings to determine if the non-moving party has sufficiently responded to the statement of undisputed material facts.  *Akines v. Shelby Cnty. Gov't*, 512 F. Supp. 2d 1138, 1147 (W.D. Tenn. 2007) (citing *Featherston v. Charms Co.*, No. 04-2157, 2005 WL 1364621, at *1 n.1 (W.D. Tenn. May 10, 2005)).[3]

To the extent Powell has submitted additional undisputed facts of her own within that document, that submission is similarly deficient.  Powell's combination of her response to Baptist's statement of undisputed facts with her own statement of undisputed facts renders determination of where one ends and the other begins impossible.  (*See* ECF No. 69-2.)  Under Local Rule 56.1(b),

---

[3] Powell also filed a Declaration that cites to her version of the undisputed facts.  (ECF No. 70-1.)  Powell asserts that her statement was made "pursuant to 28 U.S.C. § 1746" (*id.*), but "because the statement does not bear a notarial seal, was not given under oath, and is out of compliance with the requirements of an unsworn statement under 28 U.S.C. § 1746, the court cannot consider this document as evidence."  *Lee v. Swift Transp. Co. of Ariz., LLC*, No. 2:12-cv-02230-JTF-tmp, 2014 WL 897407, at *2 (W.D. Tenn. Mar. 6, 2014) (citing *Davis v. City of Memphis Fire Dep't*, 940 F. Supp. 2d 786, 799 (W.D. Tenn. 2013)).

the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

Memoranda in opposition to motions for summary judgment shall not exceed 20 pages without prior Court approval. A non-movant's statement of additional facts shall not exceed 5 pages without prior Court approval.

Again, Powell's statement of additional undisputed facts does not comply with these dictates.

The Court has, however, an interest in deciding this case on its merits and may consider "certain of [plaintiff]'s offered responses despite their violation of the Local Rules." *Golden v. Freddy's Frozen Custard & Steakburgers*, No. 2:20-cv-02805-JTF-cgc, 2022 WL 5237271, at *1 (W.D. Tenn. Oct. 5, 2022). Thus, as in *Golden*, in any instance where Powell "denies" a fact but does not cite to the record, that fact will be considered undisputed for the purposes of ruling on the motion, to the extent it is otherwise supported in the record. *Id.* at *3. And because Powell's additional facts are intermingled with her responses to Baptist's undisputed facts, making it impossible to discern whether Powell has complied with the five-page limit, the Court will consider the entirety of her submission at ECF No. 69-2.

Given the foregoing, the following facts are undisputed for the determination of this motion.

Baptist hired Powell on or about January 5, 1988, as Head Nurse in the Cardiovascular Intensive Care Unit ("CVICU"). (ECF No. 66-2 ¶ 2; ECF No. 69 ¶ 2.) In 2017, Powell was promoted to a leadership position in the CVICU, Nurse Advanced Clinician, which required that she maintain bedside care duties while assisting with education and setting protocols in the Unit.

(ECF No. 66-2 ¶ 5.)[4]  In this position, Powell was responsible for ensuring that annual

mandatory competency testing was properly completed for each nurse in the Unit, including the

semiannual bedside blood glucose monitoring recertification.  (ECF No. 66-2 ¶ 6.)[5]

In September 2018, Tara Etter, CVICU Manager, was alerted that the September 2018

bedside blood glucose competency tests appeared to have been falsified.  (ECF No. 66-2 ¶ 7.)[6]

Every test completed on September 16, 2018, had the exact same score, and the nurses all missed

the same question by choosing the same wrong answer.  (ECF No. 66-2 ¶ 8.)[7]  Powell admitted

to writing in the true and false answers for three nurses and "verbally" providing answers to the

remaining nurses.  (ECF No. 76 ¶¶ 6, 8.)  After that admission, Baptist suspended her on

September 21, 2018, pending an investigation and determination of the appropriate discipline.

---

[4] Powell does not appear to respond to this fact, and it is therefore deemed undisputed.  (*See generally* ECF No. 69-2.)

[5] Powell attempts to dispute this fact by asserting she was not trained to administer the test (ECF No. 76 ¶ 5) and by referring to the CVICU job description, which indicates that the position does not formally supervise other employees (*id.* ¶ 57 (citing ECF No. 70-2)).  However, not only does Powell acknowledge that the job description includes that the employee "[p]erforms other duties as assigned" (*id.*), but she also testified in her deposition that she was in charge of assisting with education and protocol-setting in the unit and that that one of her job duties was ensuring that annual mandatory competency testing was completed.  (ECF No. 76 ¶ 57 (citing ECF No. 66-4 (Powell Dep. 28:2–8; 31:5–20, 47:18–21)).)  Indeed, Powell acknowledges having a wide host of training duties, including helping administer annual competency tests such as the glucose recertification and helping the nurses on her unit complete their tests or ensuring that they had properly completed their tests so that they could keep working.  (ECF No. 66-4 (Powell Dep. 31:5–20, 47:18–49:25).)  Ultimately, even if Powell's citations to the record did create a material dispute of fact—which they do not—"[w]hen a plaintiff stakes himself to a version of the facts in his sworn deposition testimony, he cannot create a genuine issue of material fact by pointing to other evidence that contradicts his testimony, effectively asking the district court to disregard his own version of the facts." *Aull v. Osborne*, No. 4:07CV00016, 2009 WL 722605, at *2 (W.D. Ky. Mar. 17, 2009) (collecting cases).  This fact is therefore deemed undisputed.

[6] Powell disputes her level of involvement in the falsification of the tests, but she does not appear to dispute that the falsification occurred.  (*See generally* ECF No. 69-2.)

[7] Powell disputes her level of involvement in the falsification of the tests, but she does not appear to dispute this fact.  (ECF No. 69-2 ¶ 6.)

(*Id.* ¶ 7.)[8]  It is undisputed that Powell's suspension was without pay.  (*See, e.g.*, ECF No. 76 ¶¶

10–11, 17.)  On September 25, 2018, Powell resigned.  (*Id.* ¶¶ 10, 11.)[9]  Because Plaintiff

resigned while she was on an investigative suspension, her separation paperwork listed that she

"resigned in lieu of discharge" effective the first day of her suspension, which was Baptist's

standard practice when an employee resigns while placed on investigative suspension.  (ECF No.

76 ¶ 67.)[10]

Matthew Buyny, the CVICU's head nurse, admitted knowing Powell falsified the blood

glucose recertification test but failing to report her.  (ECF No. 66-2 ¶¶ 14, 16.)[11]  Buyny was to

---

[8] Powell attempts to dispute this fact by referencing actions Baptist took or did not take against
other employees involved in the glucose competency test incident.  (*Id.*)  Those assertions do not
establish a dispute, however, as to the actions Baptist took against her.  She further suggests that
she was actually terminated on September 21, 2018, "because that is the hospital practice once a
person is suspended," but none of the citations she offers in support of that statement contradict
this fact.  (*See* ECF No. 70-2, at Ex. A-6, Ex. B-4, Ex. E, Ex. J-2, Ex. Z.)  This fact is therefore
deemed undisputed.

[9] A factual dispute exists as to whether Baptist had completed its investigation prior to Powell
submitting her resignation.  Baptist asserts that Powell resigned on September 24, 2018, but the
email it cites shows that Powell submitted her resignation at 10:35 p.m. on September 25, 2018.
(ECF No. 70-2, at 140.)  An "Unusual Occurrence Report" dated September 24, 2018, at 7:00
a.m., however, indicates that Powell had already resigned.  (*Id.* at 144.)  Though it is possible,
based on this discrepancy, that Baptist's investigation concluded at the time of the Unusual
Occurrence Report, the record does not otherwise reflect that Baptist's final disciplinary
determination had been made at that time.  This factual dispute as to the timing of Baptist's
completion of its investigation is not, however, material to the summary judgment determination.
Powell also testified that the day after her resignation, Cynthia McCorkle, whom Powell
identifies as an "HR office clerk" (ECF No. 69-1, at 3, 5, 12, 14), told her that the decision to
terminate her had been made before she was terminated.  (ECF No. 66-4 (Powell Dep. 76:23–
77:5).)  Powell's conversations with McCorkle are addressed in more detail below.

[10] Powell asserts "that it is not a practice to use suspension date as employment termination date"
(*id.*), but she offers no evidence to support this assertion.  The fact is therefore deemed
undisputed.

[11] Powell claims in response that Buyny gave her answers to the glucose competency tests.  (ECF
No. 69-2 ¶ 15.)  That fact, even if true, does not create a dispute as to Buyny's knowledge of
Powell's falsification or his failure to report that falsification to Baptist, or as to Powell's
admission that she never reported that fact to Baptist.  (ECF No. 66-4 (Powell Dep. 106:6–9).)

be demoted, but he resigned.  (ECF No. 76 ¶ 14.)[12]  The remaining nurses who admitted they allowed Powell to complete their tests, who were in non-leadership roles, received written reprimands informing them that their behavior was unacceptable.  (ECF No. 66-2 ¶ 17; ECF No. 76 ¶ 21.)[13]  Their discipline was less severe because they were not in leadership roles and because they were following their leader's instructions.  (ECF No. 66-2 ¶ 17; ECF No. 76 ¶ 21.)[14]  Powell claims that Buyny provided her the answers to the blood glucose test, but she admitted she did not report Buyny's conduct to Baptist.  (ECF No. 66-2 ¶ 23 (citing Powell Dep. 105:22–106:9).)[15]

Powell's actions were directly contrary to Baptist's relevant policies and were sufficient to justify immediate termination. (ECF No. 66-2 ¶ 18.)[16]  Baptist typically follows a progressive disciplinary process; however, its Operations Policy, Procedure and Guideline Manual provides that "there may be circumstances when one or more [of the progressive discipline] steps are bypassed.  In fact, certain infractions or circumstances may be deemed

---

[12] Powell disputes this fact by asserting that "no document was presented to corroborate this claim in discovery a date of his resignation."  (*Id.* at 12.)  The fact is supported, however, by the deposition testimony of Anne Thompson, Baptist's Human Resources Manager (ECF No. 66-7 (Thompson Dep. 65:23–66:8)), and Powell has offered no evidence to bring it into dispute.
[13] Powell asserts the other nurses were not reprimanded or otherwise disciplined, but she offers no evidence to support that assertion, and Thompson's sworn testimony contradicts it.  (*See* ECF No. 66-7 (Thompson Dep. 44:23–45:14).)
[14] Powell disputes this fact by asserting that she was the only one who was suspended without pay and "was [the] only one adversely affected for the same misrepresentation & Fraud."  (ECF No. 69-2 ¶ 4.)  That assertion, even if true, does nothing to bring into dispute Baptist's motivation for applying less severe discipline to the other nurses.
[15] Powell disputes this fact, but she has not provided any evidence suggesting that Baptist was aware of any such allegation, and the materials she cites to support the assertion, including her deposition testimony and Baptist's discovery responses, do not support that conclusion.  (*See* ECF No. 76 ¶ 15.)
[16] Powell acknowledges that "[t]he policy offer[s] immediate termination for a serious act."  (ECF No. 76 ¶ 59.)  The rest of her response provides argument about how Baptist did not follow its policy, but none of that argument creates a dispute of this fact.

serious enough to justify immediate termination of employment." (ECF No. 66-2 ¶ 18; ECF No.

66-3, at 14.)[17] Certain expressly prohibited conduct is considered a "serious conduct violation"

that may result in immediate termination of employment, foregoing the progressive steps of

discipline. (ECF No. 66-2 ¶ 19.) One such serious conduct violation is "misrepresentation of

any documentation." (*Id.*)

In or around July 2019, one of Baptist's employees informed it that Emily Shorter, a

Caucasian clinical resource nurse, gave an answer key to nurses for the ISTAT tests.[18] (ECF No.

66-2 ¶ 25.)[19] Baptist investigated the allegations but could not corroborate them, and Shorter

---

[17] Powell does not dispute that Baptist has this policy, but she does dispute whether it is the
proper policy under which she was to be disciplined. (ECF No. 76 ¶ 1.) These policies come
from employee manuals Baptist produced during discovery. (*See, e.g.*, ECF No. 66-3, at 13–17,
62–64.) Powell appears to dispute these and other facts regarding the policies based on her
argument that she was inappropriately disciplined pursuant to these manuals because they apply
to BMHCC, the parent corporation of Baptist Medical Group. (ECF No. 76 ¶¶ 1, 3–4, 12, 16–
18, 20, 32, 54.) Although Powell appears to acknowledge that she worked for both entities, she
asserts she was "disciplined based on policies" applicable only to BMG. (*Id.* ¶ 1.) In addition,
Powell "agrees defendant has a written policy, but did not provide document of Plaintiff signed
off on understanding it at that time." (*Id.*) However, the record demonstrates that Powell
actually acknowledged receipt of these policies and completed annual trainings on the policies
and that those policies applied to her work at Baptist. (*See* ECF No. 66-4 (Powell Dep. 31:25–
36:23; ECF No. 70-2, at 147.) Even more fundamentally, however, Powell's repeated attempts
to draw a distinction between Baptist policies and BMG policies to create an issue of material
fact are undermined by her own deposition testimony. During the deposition, Baptist's counsel
acknowledged Powell "kind of work[s] for two different parts of Baptist. You work for the
hospital and you worked for another part. Did you understand that their policies regarding
conduct, serious conduct violations, would apply to you across the board?" Powell responded
"[c]orrect." (ECF No. 66-4 (Powell Dep. 38:14–20).) Thus, whether or not the cited policies are
policies of Baptist or BMG, Powell admitted that they applied to her. Any dispute about which
policies derived from which entity is therefore immaterial to this dispute.
[18] According to a July 2, 2019 email from Shorter, the ISTAT tests are similar to the glucose
tests that Powell administered. (ECF No. 66-3, at 76.)
[19] Powell disputes the facts related to the incident involving Shorter, including taking issue with
Baptist's characterization that Shorter "may" have given the answer key to ISTAT tests because,
Powell asserts, a nurse did, in fact, report such an incident. (ECF No. 76 ¶ 23.) Though a
dispute may exist as to whether the Shorter incident occurred, Powell has provided nothing to
bring into dispute the facts surrounding Baptist's investigation into Shorter or its disciplinary
decision.

denied having provided the answer key to any of the test takers.  (ECF No. 66-2 ¶ 25.)[20]  Based

on the conflicting stories, Baptist did not discipline Shorter.  (*Id.*)[21]  Etter conducted the

investigation into Powell's misconduct, but she was on paid time off during the Shorter

investigation and had no involvement in the decision-making process as to Shorter's discipline.

(ECF No. 66-2 ¶ 26.)[22]

On May 10, 2019, Powell filed a charge with the EEOC in which she alleged that she was

"terminated . . . for assisting nurses with their re-certifications."  (ECF No. 1-2.)  She stated that

she believed she was "discriminated against because of [her] race (Black) in violation of Title

VII of the Civil Rights Act of 1964."  (*Id.*)  On her EEOC Charge, she only checked the box for

race-discrimination.  (*Id.*)  Prior to submitting her EEOC Charge, Powell submitted a "Pre-

Charge Inquiry" form, or Intake Questionnaire, which the EEOC received on October 11, 2018.

(ECF No. 66-4 at 41–44.)  The Intake Questionnaire form also indicates that she believed she

was discriminated against based on her race.  (*Id.* at 42.)[23]

## PROPOSED CONCLUSIONS OF LAW

### I.    Standard of Review for Summary Judgment

Courts evaluate motions for summary judgment under Federal Rule of Civil Procedure

56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of

factually unsupported claims or defenses."  *Harper v. City of Cleveland*, 781 F. App'x 389, 392

---

[20] *See supra* note 19.

[21] *See supra* note 19.

[22] Powell appears to dispute that Etter was not involved in the Shorter investigation, but the only evidence she offers are the Coaching/Counseling forms and Unusual Occurrence Report related to Powell's own investigation. (*See* ECF No. 70-2, at 95–103, 144.)  These documents do not establish a dispute of material fact.

[23] Powell also checked the box for "retaliation" but did not elaborate as to what actions by Baptist would have represented retaliation.  (*Id.*)  The District Court previously adopted the undersigned's report and recommendation to dismiss Powell's retaliation claim.  (ECF No. 50.)

(6th Cir. 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  Thus, summary

judgment is appropriate "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (a);

*Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017) ("Summary

judgment is proper when, viewing the evidence in the light most favorable to the nonmoving

party, there is no genuine dispute as to any material fact and the moving party is entitled to

judgment as a matter of law." (quoting *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759

F.3d 522, 526 (6th Cir. 2014))).  "A material fact is one 'that might affect the outcome of the

suit,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The moving party bears the burden

of showing that no genuine issues of material fact exist."  *McClellan v. Midwest Machining, Inc.*,

900 F.3d 297, 302 (6th Cir. 2018) (citing *Celotex*, 477 U.S. at 324).

        In evaluating summary judgment motions, a court must "draw all reasonable inferences

in favor of the nonmoving party."  *Harper*, 781 F. App'x at 392 (citing *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Nevertheless, "[t]he nonmoving party

must do more than simply 'show that there is some metaphysical doubt as to the material facts.'"

*Stevens-Bratton v. TruGreen, Inc.*, 437 F. Supp. 3d 648, 652 (W.D. Tenn. 2020) (quoting *Lossia

v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)).  A properly supported motion for

summary judgment will not be defeated by conclusory allegations, speculation, or

unsubstantiated assertions.  *Bradley v. Wal-Mart Stores E., LP*, 587 F. App'x 863, 866 (6th Cir.

2014) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  "Although summary

judgment must be used carefully, it 'is an integral part of the Federal Rules as a whole, which are

designed to secure the just, speedy, and inexpensive determination of every action[,] rather than

a disfavored procedural shortcut.'" *Stevens-Bratton*, 437 F. Supp. 3d at 652 (quoting *FDIC v.*

*Jeff Miller Stables*, 573 F.3d 289, 294 (6th Cir. 2009)). Ultimately, "[w]hen the non-moving

party fails to make a sufficient showing of an essential element of his case on which he bears the

burden of proof, the moving parties are entitled to judgment as a matter of law and summary

judgment is proper." *Peterson v. Medtronic, Inc.*, No. 2:17-cv-02457-MSN-atc, 2020 WL

6999225, at *4 (W.D. Tenn. Sept. 30, 2020) (quoting *Martinez v. Cracker Barrel Old Country*

*Store, Inc.*, 703 F.3d 911, 914 (6th Cir. 2013)).

"These standards apply regardless of a party's *pro se* status; the liberal pleading standard

for *pro se* parties is inapplicable once a case has progressed to the summary judgment stage."

*Almasri v. Valero Refin. Co. – Tenn., LLC*, No. 2:20-cv-02863-SHL-tmp, 2022 WL 895732, at

*3 (W.D. Tenn. Feb. 18, 2022), *report and recommendation adopted*, 2022 WL 891842 (W.D.

Tenn. Mar. 25, 2022) (citations and internal quotations omitted).

## II.    Whether Powell Exhausted Her Claim for Age Discrimination

Baptist requests dismissal of Powell's age discrimination claim for failure to exhaust

administrative remedies. As Baptist notes, Powell's Charge of Discrimination form submitted to

the EEOC states "I believe I have been discriminated against because of my race (Black) in

violation of Title VII of the Civil Rights Act of 1964, as amended." (ECF No. 1-2, at 1.) The

box indicating discrimination based on race was checked on the Charge of Discrimination form;

the box for age discrimination was not. (*Id.*) Nothing in the narrative portion of the EEOC

charge could be interpreted as claiming age discrimination or putting the EEOC or Baptist on

notice that Powell was alleging age discrimination. In addition, the Intake Form Powell

completed makes no mention of age discrimination, and the multiple boxes that Powell could

have checked to indicate an age discrimination claim were left unchecked on that form as well.[24]
(ECF No. 66-4, at 42, 43.)[25]

In response, Powell asserts that, before her case was closed with the EEOC, "age
discrimination was mentioned, but the EEOC representative did not follow through."  (ECF No.
69-1, at 2.)  She further asserts that, in her "EEOC Position Statement response, [she] informed
Ms. Cooper the representative of what her charge should consist of."  (*Id.* at 6.)  To support this
contention, Powell provides a letter dated January 23, 2020, that she sent to Tommye Cooper
with the EEOC office in Memphis.  (ECF No. 70-2, at 90–94.)  In the letter, Powell relates that
she was in her late 40s at the time of the discrimination and that a younger, Caucasian employee
who engaged in the same behavior was not similarly disciplined, and she states that "I am in a
statutorily protected class where discrimination is unlawful when it involves my race and/or
age."  (*Id.*)  She concludes by asserting that her termination was "outright discrimination" by
Baptist based on, among other things, "[m]y race and age."  (*Id.* at 94.)  Baptist does not address
the impact of Powell's letter on its exhaustion argument.

"To pursue a Title VII action, a plaintiff must file a timely charge of employment
discrimination with the EEOC or the appropriate state agency, obtain a right-to-sue letter from
the EEOC, and file a timely complaint in federal court."  *Townsend v. Rockwell Automation,*

---

[24] In certain circumstances, an Intake Form, like the one Powell filled out, can be considered in
determining whether a party has exhausted her administrative remedies.  *Sullivan v. Progressive
Cas. Ins. Co.*, No. 2:21-cv-02314-SHM-cgc, 2022 WL 1274429, at *4 (W.D. Tenn. Apr. 28,
2022) (collecting cases).

[25] As Baptist notes, "[n]owhere in Plaintiff's Intake Questionnaire does she allege age
discrimination, and her Charge of Discrimination similarly fails to make such allegations."  (ECF
No. 76 ¶ 22.)  Powell did, however, raise age discrimination in her Position Statement to the
EEOC, and so Baptist is inaccurate in asserting that she "only raised age discrimination (despite
knowing all the factual predicates to such alleged claim) during the pendency of the lawsuit."
(*Id.* ¶ 24.)  The Court's consideration of the Position Statement is addressed in more detail
below.

*Inc.*, 852 F. App'x 1011, 1013 (6th Cir. 2021) (citing 42 U.S.C. § 2000e-5(e)(1), (f)).  "Only claims that are included in the charge or are 'reasonably related to or grow out of the factual allegations in the EEOC charge' may be heard in federal court," as those are the only claims considered to have been exhausted.  *Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229, 234 (6th Cir. 2017) (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361–62 (6th Cir. 2010)); *EEOC v. Dillard Dep't Stores, Inc.*, 768 F. Supp. 1247, 1250 (W.D. Tenn. 1991) ("[T]he filing of a 'charge' is utilized to initiate the administrative processes assigned to the EEOC in that Act and to determine whether the claim is timely made.  It also circumscribes the aggrieved party's claim.").

Typically, where a party does not provide notice in an EEOC charge that she is bringing a claim under a specific theory, such as age discrimination, she cannot be said to have exhausted her administrative remedies as to that claim.  *Russ*, 720 F. App'x at 234.  At the same time, "[c]ourts should liberally construe a plaintiff's EEOC charge to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'"  *Williams v. Shelby Cnty. Bd. of Educ.*, No. 2:17-cv-02050-TLP-jay, 2020 WL 1822475, at *4 (W.D. Tenn. Apr. 10, 2020) (quoting *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 470–71 (6th Cir. 2008)).  The Sixth Circuit has identified two circumstances where claims unraised in an EEOC charge can be pursued in federal court: if "the EEOC's investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff," or "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim."  *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998).  Neither of those circumstances are present here, where Powell's claims make no mention of her age and focus exclusively on her race.

13

Whether Powell's January 23, 2020 Position Statement can expand the scope of her claim to include a claim of age discrimination is an open question in the Sixth Circuit. Confronting similar circumstances, the court in *Tobias v. Terex, USA Inc.* was "not convinced that Plaintiff can use the intake interview and rebuttal statement" to broaden the expected scope of investigation. No. CV 20-13333, 2022 WL 3686423, at *9 (E.D. Mich. Aug. 25, 2022), *dismissed*, No. 22-1853, 2022 WL 18028369 (6th Cir. Dec. 12, 2022). "The relevant caselaw consistently refers to the *charge of discrimination* as the guiding document." *Id.* (citing *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 854 (6th Cir. 2000); *Perry v. Am. Red Cross Blood Servs.*, 651 Fed. App'x 317, 324 (6th Cir. 2016); *Younis*, 610 F.3d at 361; *Wiegel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380–81 (6th Cir. 2002)). *But see Lusane v. Conn-Selmer, Inc.*, No. 1:12 CV 2518, 2014 WL 12768814, at *5 (N.D. Ohio Aug. 12, 2014) (acknowledging arguments on both sides, and stopping short of determining whether a response may be considered in determining whether a charge has been filed, but noting that, in *Federal Express Corp. v. Holowecki*, 552 U.S. 389 (2008), "[t]he Supreme Court held that it should defer, under *Skidmore v. Swift*, 323 U.S. 134 (1944), to the EEOC's position that a document can be deemed a 'charge' so long as it may be 'reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee.'").

Courts outside of the Sixth Circuit have explicitly rejected the consideration of post-charge filings to expand the scope of an investigation beyond the allegations asserted in the charge. *See Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1171 (10th Cir. 2020) (explaining that the court's repeated holding "that the reasonable and likely scope of the investigation is determined by the allegations contained in the *Charge* itself, rather than in the

Charge and any responsive documents," applies to responsive documents filed by either party)

(quoting *Smith v. Cheyenne Ret. Invs. L.P.*, 904 F.3d 1159, 1165 (10th Cir. 2018)).  The court in

*Smith* explained that allowing such an expansion would stand in the way of the employer

"know[ing] exactly what allegations to defend itself against" and would undermine "the twin

purposes of the exhaustion requirement," i.e., to give employers notice of alleged violations and

to give the EEOC an opportunity to conciliate the claim.  904 F.3d at 1166.

The Court finds this persuasive authority compelling.  Powell's charge includes no

mention of an age discrimination claim, and there is no indication that her post-charge Position

Statement was provided to Baptist.  As such, the record does not demonstrate that Baptist

received any notice of Powell's age-discrimination claims until she filed this lawsuit, meaning

that at least one of the "twin purposes" of exhaustion identified in *Smith* has been defeated here.

Because Powell's charge did not allege age discrimination, and an age-discrimination claim

cannot reasonably be expected to grow out of her charge, Powell did not exhaust her

administrative remedies as to her age-discrimination claim.

**III.    Applying the *McDonnell Douglas* Framework to Powell's Claims of Age and Race Discrimination**

Baptist also asserts Powell's discrimination claims fail on their merits.  Baptist argues

that Powell cannot state a *prima facie* case of discrimination and cannot demonstrate that she

was constructively discharged.  Even beyond that threshold, Baptist argues Powell cannot satisfy

her obligation under the burden-shifting framework laid out in *McDonnell Douglas Corporation

v. Green*, 411 U.S. 792 (1973).

"Title VII provides, in pertinent part, that '[i]t shall be an unlawful employment practice

for an employer . . . to discriminate against any individual . . . because of such individual's race,

color, religion, sex, or national origin.'"  *Jenkins v. Plumbers & Pipefitters Union Loc. No. 614*,

971 F. Supp. 2d 737, 744 (W.D. Tenn. 2013) (quoting 42 U.S.C. § 2000e-2(a)).  Similarly, the

Age Discrimination in Employment Act ("ADEA") prohibits employers from terminating

employees "because of such individual's age."  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323

(6th Cir. 2021) (quoting 29 U.S.C. § 623(a)(1)).

Under Title VII and the ADEA, a plaintiff may establish a case of unlawful

discrimination through direct or circumstantial evidence.  *Craig v. Tenn. Dep't of Children's

Servs.*, No. 2:17-cv-02522-SHM-cgc, 2019 WL 5092401, at *4 (W.D. Tenn. Aug. 6, 2019),

*report and recommendation adopted*, 2019 WL 4093773 (W.D. Tenn. Aug. 29, 2019) (citing

*Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012)); *Geiger v. Tower

Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (citing *Martin v. Toledo Cardiology Consultants, Inc.*,

548 F.3d 405, 410 (6th Cir. 2008)).  "Direct evidence is that evidence which, if believed, requires

the conclusion that unlawful discrimination was at least a motivating factor in the employer's

actions."  *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018) (quoting *Jacklyn v.

Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).

Baptist asserts, and Powell does not sufficiently contest, that she has not submitted any

direct evidence of either race or age discrimination.[26]  She must therefore demonstrate

discrimination based on indirect or circumstantial evidence.  Unlike direct evidence of

discrimination, "circumstantial evidence does not 'on its face establish discriminatory animus,'

but discrimination may be reasonably inferred."  *Golden v. Mirabile Inv. Corp.*, 724 F. App'x

441, 446 (6th Cir. 2018) (quoting *Ondricko*, 689 F.3d at 649).

---

[26] In her brief, Powell includes a discussion of direct evidence, but she argues her case solely
based on circumstantial evidence.  (*See* ECF No. 69-1, at 10.)

Claims of discrimination based upon circumstantial evidence are evaluated under the burden-shifting framework first set out in *McDonnell Douglas* and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Plumbers & Pipefitters Union*, 971 F. Supp. 2d at 744. Under this three-step process, Plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Id.* "The *prima facie* showing requirement is not onerous." *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008). "The sole function of the prima facie stage of the burden-shifting framework is to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff . . . . It is not meant to stymie plaintiffs." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (citations and alterations omitted). Moreover, it is improper to consider "the employer's nondiscriminatory reason for the adverse employment action at the prima facie stage of the case," as it "improperly conflates the distinct stages of the *McDonnell Douglas* inquiry." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (citing *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 662–63, 666 (6th Cir. 2000)).

If a plaintiff satisfies the *prima facie* burden, "a presumption of unlawful discrimination arises against the employer, who then bears the burden of articulating 'some legitimate, non-discriminatory reason for the employee's rejection.'" *Plumbers & Pipefitters Union*, 971 F. Supp. 2d at 744–45 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). If the employer establishes such a reason at this second step, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 745 (quoting *DiCarlo*, 358 F.3d 414–15).

17

"At the motion for summary judgment stage, 'a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.'" *Id.* (quoting *Cline*, 206 F.3d at 661). "Importantly, at the summary judgment stage of litigation, courts should not allow 'th[is] burden-shifting analysis [to] obfuscate the appropriate question— whether there exists a genuine issue of material fact.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

To demonstrate a *prima facie* case in the context of a claim for race or age discrimination under Title VII or the ADEA, a plaintiff must show: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone from outside the protected class or was treated differently than similarly situated non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *DiCarlo*, 358 F.3d at 415 (Title VII race)); *Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 487 (6th Cir. 2012) (citing *Martin*, 548 F.3d at 410 (age under the ADEA)).

A.    Powell's *Prima Facie* Case (*McDonnell Douglas* Step 1)

Baptist does not dispute that Powell was a member of a protected class or that she was qualified for her position. Instead, it argues there is no dispute of material fact as to the third and fourth elements of the *prima facie* case—that Powell did not suffer an adverse employment action and that she was not similarly situated with any of the comparators she cites.

1.    *Whether Powell Suffered an Adverse Employment Action*

It is undisputed that Powell resigned from her position after Baptist began its investigation into the test-fixing allegations, but before Baptist took any permanent disciplinary

18

action against Powell.  Baptist argues that Powell's resignation cannot constitute an adverse

employment action because Baptist did not terminate her employment.  Powell argues that

Baptist took an adverse employment action against her by placing her on unpaid investigative

suspension and by constructively discharging her.

"An adverse employment action in the context of a Title VII discrimination claim is a

materially adverse change in the terms or conditions of employment because of the employer's

actions."  *Davis v. Tyson Fresh Meats, Inc.*, No. 3:19-CV-00511, 2020 WL 6459546, at *12

(M.D. Tenn. Nov. 3, 2020) (quoting *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 625 (6th Cir.

2013)).  The Sixth Circuit has "repeatedly held . . . that neither an internal investigation into

suspected wrongdoing by an employee nor that employee's placement on paid administrative

leave pending the outcome of such an investigation constitutes an adverse employment action."

*Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 631 (6th Cir. 2018) (quoting *Dendinger v.

Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006)).  "[A] suspension *with* pay and full benefits

pending a timely investigation into suspected wrongdoing is not an adverse employment action."

*Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (quoting *White v. Burlington N. &

Santa Fe Ry. Co.*, 364 F.3d 789, 803 (6th Cir. 2004)).  However, "suspension without pay

constitutes an adverse employment action."  *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488,

496 (6th Cir. 2017) (citing *White*, 364 F.3d at 803).[27]

It is undisputed that Powell's suspension was without pay.  (*See* ECF No. 76, at 14.)  The

fact that Powell only served four days of the suspension before resigning does not alter the

conclusion that the suspension without pay constitutes an adverse employment action.  *See, e.g.*,

---

[27] The *Lee* court held that the plaintiff's suspension without pay was not an adverse employment
action because the plaintiff was suspended on a Friday and resigned the next Monday, before she
could actually serve the suspension.  *Id.* at 496–97.

*McKethan-Jones v. Ohio Dep't of Health*, 7 F. App'x 475, 479 (6th Cir. 2001) (finding that a

five-day suspension without pay "clearly amount[ed] to an adverse employment action" in the

context of a Title VII retaliation claim); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir.

2004) (finding that the equivalent of a three-day suspension, if it were without pay, could

constitute an adverse employment action).  Powell has satisfactorily demonstrated that she

suffered an adverse employment action for purposes of ruling on the motion for summary

judgment.

      Powell has failed, however, to demonstrate that Baptist constructively discharged her.

Under certain circumstances, a resignation can constitute constructive discharge, such that the

plaintiff has suffered an adverse employment action.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 568

(6th Cir. 2001) (citing *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 886 (6th Cir. 1996)).  "The

constructive-discharge doctrine contemplates a situation in which an employer discriminates

against an employee to the point such that his working conditions become so intolerable that a

reasonable person in the employee's position would have felt compelled to resign."  *Davis*, 2020

WL 6459546, at *18 (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)) (internal quotations

omitted).  "When the employee resigns in the face of such circumstances, Title VII treats that

resignation as tantamount to an actual discharge."  *Id.* (quoting *Green*, 578 U.S. at 555).

      Reliance on constructive discharge "is a tough row to hoe: Constructive discharge is hard

to prove.  The employee must show that her working conditions were objectively intolerable and

that her employer deliberately created those conditions in hopes that they would force her to

quit."  *Groening*, 884 F.3d at 630 (citing *Logan*, 259 F.3d at 568–69).  "The Court examines the

working conditions through an objective lens, not asking whether *plaintiff herself* felt compelled

to resign, but whether a reasonable person would feel such compulsion."  *Garcia v. Beaumont*

20

*Health Royal Oak Hosp.*, No. 22-1186, 2022 WL 5434558, at *7 (6th Cir. Oct. 7, 2022) (citing

*Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014)).  The plaintiff must "adduce

evidence to show that 1) 'the employer . . . deliberately create[d] intolerable working conditions,

as perceived by a reasonable person,' and 2) the employer did so 'with the intention of forcing

the employee to quit.'"  *Logan*, 259 F.3d 558, 568–69 (quoting *Moore v. KUKA Welding Sys.*,

171 F.3d 1073, 1080 (6th Cir. 1999)).  "[I]ntolerability is a demanding standard."  *Benoist v.

Titan Med. Mfg., LLC*, No. 2:19-cv-02704-SHM-tmp, 2021 WL 2444952, at *5 (W.D. Tenn.

June 15, 2021), *reconsideration denied*, 2021 WL 2657276 (W.D. Tenn. June 28, 2021) (quoting

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020)).  Whether a reasonable

person would have felt compelled to resign is a fact-specific inquiry that considers, "singly or in

combination," the following factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4)
> reassignment to menial or degrading work; (5) reassignment to work under a
> younger supervisor; (6) badgering, harassment, or humiliation by the employer
> calculated to encourage the employee's resignation; or (7) offers of early
> retirement or continued employment on terms less favorable than the employee's
> former status.

*Logan*, 259 F.3d 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)).

     Baptist asserts that no final disciplinary decision was made prior to Powell's resignation,

Powell has provided no evidence that she suffered intolerable working conditions, and her

subjective belief that her termination was imminent is insufficient to support a claim for

constructive discharge.  (ECF No. 66-1, at 11.)  Powell asserts that "under the constructive

discharge theory the intent requirement 'is ultimately an objective one'" that "'can be satisfied so

long as the employee's resignation was a reasonably foreseeable consequence of the employer's

actions.[']"  (ECF No. 69-1, at 11 (quoting *Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 106 (6th

Cir. 2018).)  Powell insists that "factual questions remain for a reasonable jury to answer with regard to constructive discharge and Plaintiff."  (*Id.*)

What Powell fails to do, however, is demonstrate that she was constructively discharged.  She appears to assert that several factors contributed to her being constructively discharged: that her discharge date was backdated to the date of her suspension, that other Baptist employees were not suspended for their role in the blood glucose test incident, and that a Baptist employee suggested she was going to be terminated.  (ECF No. 69-1, at 10–12.)[28]

Powell has failed to demonstrate that any of these factors create a genuine issue as to whether Baptist "deliberately created intolerable working conditions with the intention of forcing [her] to quit."  *Laster*, 746 F.3d at 728.  First, even if it is true that Baptist backdated her suspension date, she alleges Baptist did so after she resigned, meaning that act did not contribute to her decision to resign.

Second, Powell does not explain how Baptist's decision not to suspend other employees for their role in the testing incident could make her working conditions so intolerable that a reasonable person in her position would have felt compelled to resign.  *Logan*, 259 F.3d at 568–69.  As a starting point, to the extent Powell asserts that her suspension itself constituted a constructive discharge, that argument fails.  *See, e.g.*, *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 205 (6th Cir. 2004).  In *Kinamore*, the Sixth Circuit affirmed the district court's finding on summary judgment of no constructive discharge where the employer suspended the employee for

_____

[28] Powell also generally argues that she was set up to fail by Baptist because she received no training on how to ensure the testing be completed.  (*See, e.g.*, ECF No. 69-2 ¶¶ 5, 66.)  She does not specifically make this argument in support of her constructive discharge theory, and, indeed, it could not support such a theory.  A general failure to train does not rise to the level of intolerability sufficient to constitute constructive discharge, and Powell makes no effort to demonstrate that Baptist refused to train her in an effort to compel her to resign.

three days without pay, among other forms of discipline.  The court found the discipline "well within the range of reasonable responses to the" employee's misconduct and did not indicate the employer "sought to compel her resignation."  *Id.*  Here, Baptist's decision to suspend Powell without pay pending its investigation is similarly a reasonable response to the allegations of her falsification of the test results and did not create conditions so intolerable that a reasonable person in Powell's position would have felt compelled to resign.

The fact that Baptist did not suspend other nurses along with Powell also did not create such intolerable conditions.  As discussed below in Section III.A.2, the other nurses involved in the incident were subordinates of Powell and/or committed different, less serious misconduct than she did.  Baptist's decision to impose less severe discipline on those nurses is therefore reasonable and could not have created conditions so intolerable that a reasonable person would feel forced to quit.

Third, Powell's contention that a Baptist employee suggested she was going to be terminated also cannot support her claim of constructive discharge.  In *Laster*, the court suggested that constructive discharge can take another form, explaining that, "*[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.*"  746 F.3d at 728 (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002)).  "In other words, constructive discharge also occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'"  *Id.* (quoting *Univ. of Chicago Hosps.*, 276 F.3d at 332).

Powell asserts that McCorkle, the HR representative, communicated with her during the days she was serving her suspension.[29]  (ECF No. 69-1, at 3, 5, 12, 14; ECF No. 69-2 ¶¶ 52, 61, 64, 70.)  During one of those calls McCorkle told her that "everybody is upset . . . they don't want to lose you," and "they almost got a decision."  (ECF No. 66-4 (Powell Dep. 76:13–19).)  When Powell asked her what the decision was, McCorkle responded "well, I can't tell you right now."  (*Id.* 76:19.)  Dissatisfied with that response, Powell said she "was like, you know what, I'm through with it."  (*Id.* 76:19–20.)  Then, Powell suggests that, the day after she submitted her resignation, McCorkle informed her that "they was going to terminate you."  (*Id.* 77:3–5).)[30]  Powell testified that ultimately she was forced to resign "[b]ecause it was taking them too long."  (ECF No. 66-4 (Powell Dep. 77:17–19).)[31]

The record demonstrates that McCorkle only told Powell Baptist was going to fire her the day after she had already resigned.  McCorkle's statements thus cannot have influenced Powell's assessment of whether the axe was about to fall and cannot be the source of any constructive discharge.  *See Funk v. City of Lansing, Mich.*, 821 F. App'x 574, 581 (6th Cir. 2020) (finding no

---

[29] Powell asserts that Baptist never investigated whether she was in constant communication with McCorkle.  (ECF No. 69-1, at 12.)  But whether Baptist investigated communications between Powell and McCorkle does not create an issue of material fact as to whether McCorkle told Powell before she resigned that she was going to be fired.

[30] Baptist asserts that portions of Powell's conversations with McCorkle are hearsay and not subject to any exception that would allow the Court to consider them in ruling on the motion.  (*See* ECF No. 76 ¶¶ 61, 64, 70; ECF No. 79, at 6–7.)  "It is well established that a court may not consider hearsay when deciding a summary judgment motion"; a court "may consider some *forms* of hearsay evidence[, but] such evidence must still be admissible at trial."  *Tranter v. Orick*, 460 F. App'x 513, 514 (6th Cir. 2012) (citations omitted).  It does not appear, however, that Powell offers McCorkle's statements to prove the truth of the matter asserted in those statements; she offers them to demonstrate the impact McCorkle's statements had on her decision to resign.  *See* Fed. R. Evid. 801(c).

[31] Powell suggests in her response brief that McCorkle told her in a "second instance" that "it wasn't looking good for her" and in a "3rd instance" that "they are going to terminate."  (ECF No. 69-1, at 3.)  These statements are not, however, supported by any record citation and thus cannot be considered for purposes of summary judgment.  *See* Fed. R. Civ. P. 56(c).

constructive discharge when there was nothing in the record to indicate that the defendant communicated to the plaintiff that he was going to be fired before he resigned). Though the record may contain some factual dispute over whether Baptist had actually decided to fire Powell before she submitted her resignation (*compare* ECF No. 66-2 ¶ 12 (citing Etter's and Thompson's deposition testimony that Baptist had not yet made a disciplinary decision), *with* ECF No. 76 ¶ 11 (citing an "in house document [that] proves Plaintiff was going to be terminated")), Powell does not contend that she knew any of that information before she offered her resignation. (*See* ECF No. 70-2, at 144.)

Powell was "obliged 'not to assume the worst, and not to jump to conclusions too fast'" about whether she would be terminated. *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)). She has cited no evidence in the record demonstrating that Baptist informed her she was going to be fired before she resigned. Her claim of constructive discharge on that basis must therefore fail.

> 2. *Whether Powell Was Treated Differently Than Similarly Situated Non-Protected Employees*

Baptist also argues that Powell has failed to demonstrate she was treated differently than similarly situated non-protected employees. Powell identifies multiple non-protected employees she asserts were similarly situated to her but who were treated differently—and better—than she was.

"To satisfy the similarly situated requirement, a plaintiff must show that the comparable employee is similar 'in all of the *relevant* aspects.'" *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 480 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *see also Willard*, 952 F.3d at 809 (noting that at the *prima facie* stage courts "typically compare a plaintiff to specific non-protected employees to determine

whether the other employee is similarly situated in all relevant respects").  The individuals with whom the plaintiff seeks to compare her treatment must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Warren v. Hollingsworth Mgmt. Servs., LLC*, No. 22-1064, 2022 WL 18542504, at *4 (6th Cir. Dec. 19, 2022) (quoting *Ercegovich*, 154 F.3d at 352).  "The 'same supervisor' analysis is focused less on whether the comparable employee shared the same immediate supervisor as the plaintiff and more on whether the individual who ultimately meted out the discipline to both individuals was the same."  *Barry*, 276 F. App'x at 481 (citing *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 459 (6th Cir. 2003)).  In addition, to be similarly situated courts look at "whether other employees engaged in acts of 'comparable seriousness.'"  *Id.* (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)).

First, Powell identifies Emily Shorter, a Baptist nurse who was accused of engaging in actions that were the most similar to Powell's: providing an answer key to another nurse who was taking tests similar to the one that Powell administered.  Powell appears to assert that Shorter received preferential treatment (not being suspended during the investigation) because she was white and younger.  (ECF No. 69-1, at 9, 16.)

Despite the similarity of the incidents, however, significant differences exist as well. Most fundamentally, though Powell admitted providing answers to the blood glucose competency tests, Shorter did not, and Baptist's investigation into those allegations did not corroborate them.  (ECF No. 66-2 ¶ 25.)  The inability to substantiate the allegations regarding Shorter's violation, compared with Powell's admission of her own violation, explains the

difference in discipline imposed in the two cases and demonstrates that Shorter was not similarly situated to Powell.

Moreover, Etter, who conducted the Powell investigation and made the decision to place her on suspension, was on paid time off when Shorter was investigated and was not involved in disciplining Shorter.  "[A] plaintiff and a comparable employee are not similarly situated where they were disciplined by different ultimate decision-makers."  *Barry*, 276 F. App'x at 481 (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762–63 (6th Cir. 2000)).  In *Barry*, the allegations against the plaintiff were investigated by a human resources manager and a vice president of the company.  *Id.* at 482.  The manager had been on maternity leave during the investigation of the plaintiff's proposed comparator, however, and the vice president was altogether unaware of that incident.  *Id.*  The court ultimately concluded that there was "not even a scintilla of evidence that either of those individuals had any involvement in the handling of the [comparator's] incident" and found no "evidence from [] which a reasonable jury could conclude that [the plaintiff and his comparator] shared the same supervisor."  *Id.* at 483.  The fact that the ultimate decision maker was different in the Powell and Shorter matters similarly requires a finding that they were not similarly situated.

Nor was Powell similarly situated to the nurses she supervised.  Powell argues that those nurses, who engaged in fraudulent conduct by letting her answer their tests for them, were not terminated and that she was the only one who received adverse discipline for the incident.  (*See, e.g.*, ECF No. 76 ¶¶ 4, 11, 12, 39, 69.)  However, though Powell refers to her subordinates as "un-protected" in her brief (ECF No. 69-1, at 19), she cites no evidence from the record that any of the subordinate nurses are in a non-protected class.  Powell bears the burden at the *prima facie* stage of demonstrating that similarly situated non-protected employees were treated more

27

favorably.  *See Haji v. Columbus City Sch.*, 621 F. App'x 309, 315 (6th Cir. 2015) (citing *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)).  Her failure to show that the subordinate nurses did not belong to a protected class is fatal to her argument that those subordinates can satisfy this aspect of her *prima facie* case.

Powell also fails to demonstrate her subordinates were similarly situated.  Unlike Powell, those nurses were not in leadership positions, and "employees who are in higher positions can be held to higher standards."  *Pelcha*, 988 F.3d at 328–29 (citing *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020), for the proposition that "managers can be 'subject to a different standard of conduct'")).  In addition, Powell's conduct was different than that of the other nurses.  Powell, as the supervisor, provided answers to her subordinates, who followed her instructions.  Ultimately, as was the case in *Pelcha*, Powell and the nurses she supervised were not subject to the same standards and did not engage in the same conduct.  *Id.* at 329 (citing *Ercegovich*, 154 F.3d at 352).  They were therefore not similarly situated.

Powell has not shown that Buyny was similarly situated either.  Buyny, the CVICU's head nurse, who is a white male, admitted knowing Powell falsified the blood glucose recertification test but failed to report her and resigned before he could be demoted.  Powell asserts that, by opting to demote Buyny rather than terminate him, and not suspending him during the investigation, Baptist treated him better than her.[32]  (ECF No. 76 ¶ 7.)  But Buyny's

---

[32] Powell also testified that Buyny provided her the test answers before she provided them to her subordinates (ECF No. 66-4 (Powell Dep. 105:2–6, 105:22–106:9)), presumably in an attempt to show that Buyny's misconduct was more serious than a mere failure to report and thus more closely aligned with her own misconduct.  However, as Powell acknowledged, she never informed Baptist of Buyny's alleged actions.  She therefore cannot show that Baptist treated Buyny differently than her for similar conduct, when Baptist did not know about that alleged conduct.  *See Laney v. Ohio Dep't of Youth Servs.*, 448 F. App'x 553, 556 (6th Cir. 2011) (finding that an employer could hardly be faulted "for not meting out discipline for infractions it did not know about").

failure to report Powell's wrongdoing is demonstrably different from Powell's admitted

falsification, and thus Powell's attempt to draw similarities between herself and Buyny fails.

*See, e.g.*, *Owhor v. Providence Hosp. & Med. Ctrs., Inc.*, No. 09-11257, 2010 WL 3070106, at

*9 (E.D. Mich. Aug. 4, 2010) (finding a "distinct difference between not reporting" misconduct

and actually committing the misconduct).  Buyny did not engage in acts of comparable

seriousness to Powell's and thus was not similarly situated to her.

      Given Powell's failure to establish that any of the non-protected comparators she cites

were similarly situated, her claims necessarily fail.

      B.     Baptist's Nondiscriminatory Justification (*McDonnell Douglas* Step 2)

      Baptist contends that, even if Powell satisfied her *prima facie* burden, her claims fail

because Baptist articulated a nondiscriminatory reason for terminating her.  At the second

*McDonnell Douglas* step, the employer's burden is low and "is satisfied if he simply 'explains

what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Jackson*,

814 F.3d at 779 (quoting *Burdine*, 450 U.S. at 256).  That obligation "is merely a burden of

production, not of persuasion, and it does not involve a credibility assessment."  *Upshaw v. Ford

Motor Co.*, 576 F.3d 576, 585–86 (6th Cir. 2009).  Ultimately, a "defendant must clearly set

forth, through the introduction of admissible evidence, reasons for its actions which, if believed

by the trier of fact, would support a finding that unlawful discrimination was not the cause of the

employment action."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citations and

quotations omitted).

      Baptist has met its burden by demonstrating that the reason it suspended Powell was her

role in the falsification of the tests.  If the trier of fact were to believe Baptist's evidence that a

person in Powell's position who admitted to falsifying mandatory competency certifications

would be suspended, that evidence would support a finding that Baptist's decision was not a result of unlawful discrimination. Having provided an adequate non-discriminatory justification, Baptist shifts the burden to Powell to demonstrate that the justification is merely pretextual under *McDonnell Douglas*'s third step.

      C.    <u>Whether Baptist's Nondiscriminatory Justification Was Pretext (*McDonnell Douglas* Step 3)</u>

At the final stage of the *McDonnell Douglas* analysis, "the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano*, 663 F.3d at 815 (citing *Burdine*, 450 U.S. at 256). A plaintiff can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation omitted). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which [a] jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against him." *Willingham v. Regions Bank*, No. 2:09-cv-02289, 2010 WL 2650727, at *5 (W.D. Tenn. July 1, 2010) (quoting *Johnson*, 319 F.3d at 866) (internal citation omitted).

Ultimately, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515. In attempting to establish pretext, Powell's conclusory allegations and subjective beliefs are "wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Neff v. City of E. Lansing*, 724 F. App'x 448, 452–53 (6th Cir. 2018) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992)). Ultimately, "Title VII 'does

not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.  Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons.'"  *Horn v. City of Cleveland*, 674 F. App'x 511, 518 (6th Cir. 2017) (quoting *Browning v. Dep't of Army*, 436 F.3d 692, 698 (6th Cir. 2006)).

Baptist asserts that its reason for suspending Powell—her facilitating the cheating on the blood glucose competency test—was based in fact, motivated its decision, and was sufficiently warranted, rendering its decision non-pretextual.

### 1.    *Baptist's Decision Was Based in Fact*

To show that Baptist's decision to suspend her was not based in fact, Powell must demonstrate that Baptist's "proffered bases for [the adverse employment action] never happened, *i.e.*, that they are factually false."  *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 751 (6th Cir. 2019) (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)).  This "first type of showing is easily recognizable."  *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 610 (6th Cir. 2013) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds as recognized by Geiger*, 579 F.3d 614, 621).

Though Powell has disputed the breadth of the cheating that she helped facilitate on the blood glucose competency tests, she does not contend that it never occurred and admits that she filled in the true/false answers for three nurses and orally provided answers to the remaining nurses.  (ECF No. 76 ¶¶ 6, 8.)  Powell cannot demonstrate that Baptist's decision was pretextual on this basis.

2.      *Baptist's Reason for Suspending Powell Was Motivated by Her Conduct*

To demonstrate that Baptist's proffered reasons for suspending her were not actually motivated by the cheating incident, Powell must "'indict the credibility of [Baptist's] explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by [Baptist],' and ultimately show that it is 'more likely than not' that [Baptist's] proffered reason is pretext." *Williams*, 790 F. App'x at 752 (quoting *Hedrick*, 355 F.3d at 460). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084.

Here, Powell has not provided any evidence, circumstantial or otherwise, that Baptist's decision to suspend her was motivated by her race or her age, instead of by her role in the cheating scheme. She thus cannot demonstrate that Baptist's decision was pretextual on this basis.

3.      *Powell's Suspension Was Sufficiently Warranted*

Satisfaction of the third pretextual prong "ordinarily[] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff[.]" *Williams*, 790 F. App'x at 753 (quoting *Hedrick*, 355 F.3d at 461).

Here, for the reasons articulated in Section III.A.2, the actions of Powell's fellow employees who were not terminated, including Buyny and the subordinate nurses, cannot be said to have been substantially identical to the conduct Powell engaged in. Unlike any of those comparators, Powell admitted to being the source of the answers to the questions from the blood glucose competency tests. The other employees Powell cites thus cannot be said to have

32

engaged in substantially identical conduct, and Powell cannot demonstrate that Baptist's decision was pretextual on this basis.

## **RECOMMENDATION**

For the foregoing reasons, this Court recommends that Baptist be granted summary judgment as to all of Powell's claims.

Respectfully submitted this 22nd day of February, 2023.

s/Annie T. Christoff
ANNIE T. CHRISTOFF
UNITED STATES MAGISTRATE JUDGE

## **NOTICE**

Within fourteen (14) days after being served with a copy of this report and recommendation disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute waiver of objections, exceptions, and further appeal.